# EXHIBIT A

1

Volume 1, Pages 1 - 53

Exhibits: 1 - 6

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CYNTHIA BALER

Plaintiff

vs.                    Docket No. CA 04-1185-PBS

UNITED STATES OF AMERICA

Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF STEPHEN J. KELLEY

Tuesday, February 22, 2005, 10:49 a.m.

Ravech & Roy, PC

One Exeter Plaza

699 Boylston Street

Boston, Massachusetts


- - - - - - - Reporter: Kathleen L. Good, CSR, RPR - - - - - - -

K. L. GOOD & ASSOCIATES

Post Office Box 367

Swampscott, Massachusetts 01907

Tel. 781-367-0815   Fax 781-598-0815

7

1   A.   City carrier.

2   Q.   Was that from 1981 to '84?

3   A.   That was from '78 all the way up.

4   Q.   '78 all the way up.

5        As the supervisor for customer service,

6        what were your duties and responsibilities at

7        the Medfield Post Office?

8   A.   I had all the responsibilities of the building,

9        all employees, city areas, rural carriers and

10       clerks.

11  Q.   So you were generally responsible for the

12       building and the employees?

13  A.   Uh-huh.

14       Postmaster is just a figurehead,

15       unfortunately.

16  Q.   Was the postmaster physically located at the

17       Medfield Post Office?

18  A.   He went home at eleven o'clock every day.

19  Q.   So you would generally run the show?

20  A.   Uh-huh.  He'd come in at four and go home at

21       eleven.  I'd come in at 8:30, 8:00, and stay

22       until six.

23  Q.   What responsibilities did you have with regard

24       to the building itself?

K. L. GOOD & ASSOCIATES

8

1   A.   To make sure that it was clean, no unsafe acts

2        could happen there.

3   Q.   I didn't get the second part.

4   A.   Make sure everything was safe in the building,

5        that there was no broken windows, doors locked,

6        weren't damaged or tampered with.

7   Q.   What did the Medfield Post Office facility

8        consist of?

9   A.   As far as what do you mean?

10  Q.   What type of a building was it?  How many

11       floors?

12  A.   One floor.  Brand new building.  It's seven

13       years old.  It's one floor, no cellar and no

14       attic.  Well, crawl space attic, that's about

15       it.

16  Q.   Do you know how many square feet the building

17       is?

18  A.   Not offhand, no.

19  Q.   The customer area, how big is that?

20  A.   I couldn't tell you.

21            MR. ROY:  I have a diagram here.

22            (Marked, Exhibit No. 1, Diagram.)

23  Q.   Let me show you a diagram marked as Exhibit

24       No. 1.

10

1   A.   Right.

2   Q.   Could you draw on this diagram an outline of,

3        just a general configuration of the postal

4        service building?

5             (Witness complies.)

6   Q.   In blue pen, you've done a general layout of the

7        building.

8             Where is the front door?

9             (Witness complies.)

10  Q.   Now, are there two doors to enter?

11  A.   There's one door on this side, one door on this

12       side and door on the side for people to come

13       from here to here.

14  Q.   Two doorways off of North Street?

15  A.   Correct.

16  Q.   And then --

17  A.   They're all off of North Street really because

18       this here is another business complex right

19       here.

20  Q.   So if I'm looking at the building from North

21       Street, there's two entrances directly in front

22       of me --

23  A.   Correct.

24  Q.   -- on North Street.

K. L. GOOD & ASSOCIATES

11

```
 1              Then there would be one to the left
 2       side?
 3    A.   Uh-huh.
 4    Q.   Is that correct?
 5    A.   Uh-huh.
 6    Q.   That would be like a side entrance?
 7    A.   Yeah.  Some of the handicapped people would use
 8         that one.
 9    Q.   Did all of these entranceways lead to a
10         vestibule area?
11    A.   That would be it, right where the clerk's office
12         is.  The whole area for window clerks, down this
13         small corridor here would be the box section,
14         where people have post office boxes, all around
15         there.  This is all mainly for the carriers and
16         clerks area, postmaster office.
17    Q.   Do you walk right in from the street into the
18         clerk's area?
19    A.   No.
20    Q.   Or is there a vestibule area before you get into
21         the building?
22    A.   Are you talking about employees or customers?
23    Q.   Customers.
24    A.   Customers don't even go into the building.  They
```

16

1  Q.  And they were there until the end of 2002?

2  A.  Around October of -- October, November, 2002.

3  Q.  Sometime shortly after the incident at issue

4      here; is that correct?

5  A.  Uh-huh.

6  Q.  What did G and K actually do at that building

7      when they were working there?

8  A.  They took all the rugs out and put new rugs in,

9      took mop heads out, put new mop heads in.  I

10     believe it was once a week.

11 Q.  Who contracted with G and K?  Was it the post

12     office or the landlord for the building?

13 A.  The post office.

14 Q.  And who was the contact with G and K?

15 A.  That I don't know.

16 Q.  Did you ever have any contact or communications

17     with them?

18 A.  No.

19 Q.  Did you ever see them in the building?

20 A.  Yeah.  I seen them come in.  I'd have to sign

21     the slip every time they came in.

22 Q.  They came in when the building was open?

23 A.  Right.  I had to go around and make sure

24     everything was new they put in and not just

K. L. GOOD & ASSOCIATES

18

1       done on a weekly basis?

2    A.   The postmaster would have.

3    Q.   What would happen to the mats in that week prior

4        to changing them?

5    A.   What do you mean?

6    Q.   Well, did they get dirty?  Did they get beat up?

7    A.   They'd get dirty with the people coming in,

8        especially if you had a snowstorm or rain.

9    Q.   It's your memory that they would physically

10       remove the mats and replace them with newer

11       ones?

12   A.   Yes.

13   Q.   What is the difference between the two mats

14       shown in Exhibit No. 2?

15   A.   That's not a mat.  That's built into the floor.

16       That's like a stone type thing.  Probably tiled

17       with, like, little grids in it and slatted.

18   Q.   Do you know what the purpose of that device is?

19   A.   That was put in when they built the building.

20       The town had a lot to do when they built that

21       building.

22   Q.   What do you mean by that?

23   A.   They had a lot of say in how the building was

24       going to be set up, designed, how big it was.

K. L. GOOD & ASSOCIATES

20

1    Q.   So the only thing that G and K would replace
2         with regard to Exhibit No. 2 would be the black
3         mat which is shown in the center?
4    A.   Correct.
5    Q.   What was that black mat made of?
6    A.   I have no idea what they're made of.  It's just
7         a rug.
8    Q.   Do you know, was there any rubber component to
9         it?
10   A.   On the back.
11   Q.   Rubber on the back?
12   A.   Rubber back.  Bristle-type thing, because it
13        would just wipe the feet off, the shoes, bottom
14        of your shoe.
15   Q.   How long has the post office had those black
16        mats in the vestibule area?
17   A.   Before I came, I suppose.
18   Q.   So they've been there so long as you've been
19        there?
20   A.   I'm guessing, yeah.  I'm almost sure they were
21        because I saw bills from the time I got there
22        because I trace back to see what they were.  So
23        they had to be there since the building opened
24        and that was two years before I came there.

K. L. GOOD & ASSOCIATES

25

1   who made the determination as to which mats

2   would be eliminated?

3   A.  I did.

4   Q.  Was anybody else consulted?

5   A.  No.

6   Q.  Why did you choose the mat in the vestibule as

7       one that should be eliminated?

8   A.  Because I thought the ones in the lobby were

9       enough to take care of the traffic that we had.

10  Q.  What did you use these mats for?

11  A.  I'm sorry.  What do you mean?

12  Q.  In making that decision as to which ones to

13      eliminate and which ones to keep --

14  A.  I thought the ones in the lobby were more

15      important than the ones in the hallway or

16      vestibule, whatever you want to call it, because

17      we had the slat ones there already.  I decided I

18      didn't want that one; I wanted the ones in the

19      lobby.

20  Q.  What was the purpose that you used the mats for

21      at the post office?

22  A.  Because people track things in.  We try to keep

23      it clean and neat.  And it stops water from

24      being on the floor in case somebody could slip

K. L. GOOD & ASSOCIATES

26

```
 1         on it.
 2    Q.   Did you ever have any occasions where people
 3         slipped, tripped over any of these mats?
 4    A.   No.
 5    Q.   Did you ever hear of anyone -- in the answers to
 6         interrogatories, there was a question about
 7         whether anybody had been injured from one of
 8         these mats, but aside from just injuries, did
 9         you ever hear or see anyone who stumbled when
10         going across a mat or tripped going across a
11         mat?
12    A.   No.
13    Q.   Did anyone ever say anything to you about mats
14         bubbling or bunching up in the vestibule areas?
15    A.   No.
16    Q.   Let's jump to the incident involving Ms. Baler.
17              Do you remember that incident?
18    A.   Somewhat.
19    Q.   Tell me what you remember about it.
20    A.   I just remember that somebody came and got me
21         and said that the lady had fell in the hallway,
22         the husband was there, came and told them, they
23         came and told me and I went out there.
24    Q.   Did you see --
```

40

1   A.   I don't know if it was me or the postmaster or

2        one of my employees, to be honest with you.  I

3        couldn't say I did it or whoever did it.

4   Q.   Is that part of the accident investigation

5        procedure --

6   A.   Yes.

7   Q.   -- to take photographs?

8   A.   Uh-huh.

9   Q.   Is there any way of determining who it was that

10       took these photographs?

11  A.   No.  The postmaster is deceased so if he did

12       it -- unless you can talk to him.  Ask him what

13       tomorrow's number is going to be, would you.

14  Q.   We'll all retire.

15            Did you ask around any employees to see

16       whether or not they had taken the photographs?

17  A.   No, I didn't.

18  Q.   With regard to Exhibit No. 6, can I direct your

19       attention to Item No. 44 on the bottom.

20            Do you see that?

21  A.   Uh-huh.

22  Q.   There's a check box on there that indicates:

23            "Recommended that claim be allowed if

24       filed, in your opinion."

K. L. GOOD & ASSOCIATES

42

1    they saw or observed relative to this fall?

2  A.  There was no way anybody could have saw what

3      happened out there.  There's a wall there, as

4      you can see.

5  Q.  Do you know if any employees were out in the

6      vestibule area?

7  A.  No.

8          MR. ROY:  Let's take a break for about

9      five minutes and I'll review my notes.

10         (Recess.)

11 Q.  Aside from talking with your attorney, what did

12     you do, if anything, to prepare for today's

13     deposition?

14 A.  Nothing.

15 Q.  Did you review any documents or anything?

16 A.  No.

17 Q.  Did you review any photographs?

18 A.  No.

19 Q.  Speak to any employees at the post office?

20 A.  No.

21 Q.  Two folks were identified in the answers to

22     interrogatories as window clerks.  Phil

23     Galafaro.

24 A.  Paul Galifaro?

46

1          Just try to wait for me to finish my

2     question and answer so it's clear on the record.

3  A.  Okay.

4  Q.  Did anyone during the week check on those mats,

5     the black mats that are depicted in Exhibit

6     No. 3?

7  A.  I do once or twice a day, my custodian who goes

8     out there or the cleaning guy goes out there,

9     cleans them every day.

10 Q.  What is the name of your custodian?

11 A.  The cleaning company, Olympic Cleaning.

12 Q.  He would do that how many times a day?

13 A.  Once a day.  Cleans, washes and vacuums.

14 Q.  And you would check on it once or twice a day

15    yourself?

16 A.  Yes.

17 Q.  How long have you been using Olympic Cleaning?

18 A.  They've been there since I've been there and

19    before.

20 Q.  Exhibit No. 2 shows -- you mentioned the black

21    mats and you mentioned these -- did you call

22    them slate mats?

23 A.  It's embedded in the floor.  They're like

24    grates.

53

STEPHEN J. KELLEY
SIGNATURE PAGE/ERRATA SHEET

PAGE    LINE      CHANGE OR CORRECTION AND REASON

____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____
____|____|_____

I have read the transcript of my deposition taken on February 22, 2005.
Except for any corrections or changes noted above I hereby subscribe to the
transcript as an accurate record of the statements made by me.
Signed under the pains and penalties of perjury.

                                    DATE 3·31·05

Deponent, STEPHEN J. KELLEY

# EXHIBIT B



