**EXHIBIT A**

1

Volume 1, Pages 1 - 53

Exhibits: 1 - 6

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

CYNTHIA BALER

Plaintiff

vs.                             Docket No. CA 04-1185-PBS

UNITED STATES OF AMERICA

Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF STEPHEN J. KELLEY

Tuesday, February 22, 2005, 10:49 a.m.

Ravech & Roy, PC

One Exeter Plaza

699 Boylston Street

Boston, Massachusetts


- - - - - - -Reporter: Kathleen L. Good, CSR, RPR- - - - - - -

K. L. GOOD & ASSOCIATES

Post Office Box 367

Swampscott, Massachusetts 01907

Tel. 781-367-0815   Fax 781-598-0815


K. L. GOOD & ASSOCIATES

21

| | | |
|---|---|---|
| 1 | | October, they left. The other one came in and |
| 2 | | last year we stopped putting them down because |
| 3 | | of cutbacks, my budget got cut. |
| 4 | Q. | So G and K worked there with putting these mats |
| 5 | | in until sometime near the end of 2002? |
| 6 | A. | Uh-huh. |
| 7 | Q. | When the new company came in, that's this -- |
| 8 | A. | Cintas. |
| 9 | Q. | -- Cintas, did they continue with putting down |
| 10 | | the mats? |
| 11 | A. | Up until the first part of 2004. |
| 12 | Q. | Then what happened in 2004 to end that practice? |
| 13 | A. | Budget cut. |
| 14 | Q. | What do you mean by that? |
| 15 | A. | Cut back as much as you can. Don't spend as |
| 16 | | much money. If you don't need it, don't buy it. |
| 17 | | So now I have just ones on the inside, nothing |
| 18 | | on the outside. |
| 19 | Q. | And how did you determine which mats to keep and |
| 20 | | which mats to eliminate? |
| 21 | A. | The ones I really felt I didn't need as much. |
| 22 | | Most of them were on the inside, where the |
| 23 | | employees are. And this one out here. |
| 24 | Q. | How many mats were placed around the post office |

23

1  that a swinging door or sliding door?
2  A. No. You have to open it. One goes in and one
3  goes out. This one -- trying to think which
4  way -- that one goes in and that one comes out.
5  Q. So this door that we can see towards the front
6  of the photo and to the right of the black mat
7  would swing out towards the mat?
8  A. Uh-huh.
9  I'm trying to think now. No. That's
10  in, that's out. Because you come in this way
11  and go out that way.
12  Q. Let me show you some other photos. It might
13  help.
14  These are some other photographs. See
15  if those help you in determining whether that
16  door swings in or out.
17  (Pause.)
18  A. I am almost positive this one here is the one
19  that they come in and this is the one they're
20  going out. I don't believe they go both ways
21  but there's a possibility. I just see enter and
22  exit.
23  Q. You're not sure, though, as you sit here today,
24  whether the doors go both ways?

```
                                                          24
 1   A.   Right.
 2   Q.   Have you ever had, in your years there at the
 3        Medfield Post Office, any issues with these mats
 4        bubbling or getting hit by the door?
 5   A.   No.
 6   Q.   Do you know what I mean by "bubbling"?
 7   A.   Uh-huh.
 8   Q.   I'm looking at this photograph -- we'll get them
 9        marked.  Do you see these series, it looks like
10        Polaroid photographs?
11   A.   Okay.
12   Q.   Do you see this ripple in the carpet?
13   A.   Yes, I see something.
14   Q.   Do you know how that happened on these --
15   A.   No.
16   Q.   Have you ever seen that before?
17   A.   Not to my knowledge, no.
18   Q.   Do you know who took these photographs?
19   A.   Could have been one of the employees took them.
20        Could have been me.  Could have been the
21        postmaster, the next day.  I don't know, to be
22        honest with you.
23             (Marked, Exhibit No. 3, Photographs.)
24   Q.   Going back to the mats which were eliminated,
```

```
                                                          39
 1        problems coming up worrying about this.  I may
 2        have put the wrong date down on that.
 3   Q.   I know you have 9/11/2002 on page 1.  But 9, it
 4        looks like 9/19.  Is that how you would make a
 5        19?
 6   A.   Yeah.
 7   Q.   You have a specific memory of having done this
 8        before September 19, 2002?
 9   A.   It has to be done within 48 hours so I know
10        that's got to be done within 48 hours.
11   Q.   What do you do with the form once you're done
12        with it?
13   A.   I send it into injury comp and they, in turn,
14        goes from there.
15   Q.   This received stamp, is that something that's
16        applied by Medfield --
17   A.   No.
18   Q.   -- or somewhere else?
19   A.   Somewhere else.
20   Q.   Do you fax it or mail it?
21   A.   I mail it.
22   Q.   The photographs that we had previously marked as
23        Exhibit No. 3, am I clear that you have no idea
24        who took these photographs?
```

```
                                                              40
 1   A.   I don't know if it was me or the postmaster or
 2        one of my employees, to be honest with you.  I
 3        couldn't say I did it or whoever did it.
 4   Q.   Is that part of the accident investigation
 5        procedure --
 6   A.   Yes.
 7   Q.   -- to take photographs?
 8   A.   Uh-huh.
 9   Q.   Is there any way of determining who it was that
10        took these photographs?
11   A.   No.  The postmaster is deceased so if he did
12        it -- unless you can talk to him.  Ask him what
13        tomorrow's number is going to be, would you.
14   Q.   We'll all retire.
15             Did you ask around any employees to see
16        whether or not they had taken the photographs?
17   A.   No, I didn't.
18   Q.   With regard to Exhibit No. 6, can I direct your
19        attention to Item No. 44 on the bottom.
20             Do you see that?
21   A.   Uh-huh.
22   Q.   There's a check box on there that indicates:
23             "Recommended that claim be allowed if
24        filed, in your opinion."
```

K. L. GOOD & ASSOCIATES